**F I L E D**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

**OCT 0 1 2014**

DAVID J. MALAND, CLERK
BY
DEPUTY _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 1:14-CR-83 |
| v. | § | (Judge Marcia Crone) |
| | § | |
| SHANE DEWAYNE HADNOT | § | |

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### Introduction

1.  At all times relevant to the indictment, until November 7, 2013, Alfred Wright lived in Jasper, Texas. Wright was employed as a licensed physical therapy assistant for Rehab-to-Go, a two-person home-healthcare company calling on patients in the Sabine County area of Texas. Sabine County is located north of Jasper in East Texas and includes the communities of Fairmont and Hemphill.

2.  Hemphill is a rural community located along State Highway 87 approximately 35 miles north of Jasper. The Hemphill area is surrounded by the Sabine National Forest and the Toledo Bend Reservoir. The topography in this area includes large wooded thickets, dense low brush, rolling hills, and fenced pastures. The area is not densely populated.

3.  Wright's work schedule usually required him to drive to Hemphill every Tuesday and Thursday, and Wright drove a 2008 Dodge Ram pickup truck. The

First Superseding Indictment – Page 1

truck was registered to Wright's father.  Alfred Wright was well liked by everyone who knew him, particularly his patients.

4.   At all times relevant to the indictment, **Shane Dewayne Hadnot (Hadnot)**, defendant, lived in Jasper, Texas.

### Alfred Wright – Missing Person Case

5.   On Thursday, November 7, 2013, Wright was scheduled to visit approximately ten patients in the Hemphill area, but he only visited two.  At 12:36 p.m., before beginning his patient visits, Wright used his cellular telephone (cell phone) to text message **Hadnot**.  The text message said "1 gino and a 20 and 3 handles," meaning one gram of cocaine, $20 worth of methamphetamine, and three Xanax (alprazolam) tablets.  At 12:37 p.m., **Hadnot** replied "ok" to Wright's text message.

6.   Wright visited his first patient around 1:30 p.m., in Burkeville, Texas. Burkeville is approximately 21 miles east of Jasper, and approximately 31 miles south of Hemphill.  That patient and his wife reported that Wright was "normal" and noted nothing unusual about his demeanor or actions.  The patient and his wife said that Wright left their residence around 2:00 p.m. to continue his route.

7.   Between 2:00 p.m. and 4:00 p.m., Wright did not visit any patients, which was unusual.

**First Superseding Indictment – Page 2**

8.  Wright visited his next patient around 4:00 p.m. in the Fairmont community approximately 15 miles south of Hemphill.   That patient and his wife reported that Wright was unusually late, agitated, and disoriented.  Wright repeated that he felt "sick" and "needed to call his wife," and excused himself to the restroom for a lengthy period.  They found this odd and even counseled Wright to return home, but Wright stated that he had "one more patient to see" and left their residence around 4:30 p.m. From there, Wright should have travelled west to continue his route along the highway, but Wright drove east until he reached the Toledo Bend Reservoir.  Wright pulled into a residential driveway where a witness spoke to Wright and found him to be extremely disoriented and unable to communicate clearly.  The witness directed Wright to leave the property and Wright drove west toward the highway.

9.  Around 5:20 p.m., Wright arrived at the CL&M store located on Texas Highway 87, approximately four miles south of Hemphill.  At that time, Wright exchanged telephone calls with Lauren Wright, his wife.  Wright told Lauren Wright that his truck overheated and she told Wright that his parents were in route to assist him.  A witness at the store watched Wright in the parking lot and observed him talking on a cell phone.  According to the witness, when Wright stopped talking on the cell phone, he put the phone in his sock and jogged north on Highway 87. It was dusk.

**First Superseding Indictment – Page 3**

### The Search for Alfred Wright

10. Around 6:30 p.m., Wright's father, Douglas Wright, entered the Sabine County Sheriff's Office (SCSO) and reported that Wright was missing.

11. Around 7:35 p.m., SCSO Deputy Kevin Windham interviewed Douglas Wright at the CL&M store. Deputy Windham then telephoned Wright's wife, Lauren Wright, to interview her. During that interview, in response to a question from Deputy Windham, Lauren Wright said that she had not observed "anything unusual" about Wright's recent behavior. A few minutes later, however, Lauren Wright telephoned Deputy Windham and recanted her prior statement about Wright's behavior, saying that Wright had in fact "been acting very strange lately." Lauren Wright also told Deputy Windham that she suspected that Wright was "on something," meaning some unknown narcotic substance. Lauren Wright then, on Deputy Windham's request, sent a photograph of Wright to Deputy Windham's cell phone. Deputy Windham and another deputy then searched along Wright's route from approximately 7:50 p.m. until 2:00 a.m., but were unable to find Wright. After that, Deputy Windham watched Wright's truck at the CL&M store until 3:30 a.m., but Wright never returned to the truck.

12. Around 7:00 p.m. on November 7, 2013, property owners residing off Coussons Drive, approximately 1.10 miles northeast of the CL&M store, were outside their home when they heard what they thought was a person running across their yard.

They also heard a loud "cough."  One of the property owners called out, but there was no response and they dismissed the event as animal activity.

13.    The next morning, on November 8, 2013, SCSO Deputy David West requested permission from Wright's parents to search Wright's truck, which was still parked and locked at the CL&M store.  Wright's parents did not consent to the search and told Deputy West that the family was in route and that they would contact him upon arrival.  Deputy West then served a court order on AT&T to obtain tracking information on Wright's cell phone.  When the family arrived, they searched the truck and removed Wright's work computer and personal computer without calling a deputy.

14.    Later that morning, on November 8, 2013, the property owners residing off Coussons Drive reported to the SCSO that they had discovered torn clothing and a wrist watch belonging to Wright.  The small piece of torn clothing was attached to a barbed-wire fence, approximately forty-five yards from the residence, near the location from which they had heard noises around 7:00 p.m. the previous night.  SCSO deputies searched the pastures around the residence and found additional clothing belonging to Wright.  The additional clothing was scattered along a distance of approximately 1,700 yards on pastures adjacent to the residence.

15. The SCSO, with assistance from the Texas Department of Criminal Justice (TDCJ), initiated a ground search outward from the residence. TDCJ tracking dogs followed Wright's scent from the residence to a bayou located approximately 1,100 yards northeast of the residence. The tracking dogs lost Wright's scent at the bayou. Texas Parks and Wildlife agents searched the bayou but were unable to locate Wright. The SCSO made repeated requests for a search aircraft but no aircraft was available.

16. The ground search continued with limited interruption until 5:00 p.m. on November 11, 2013. The search was led by the U.S. Forest Service and included the Texas Parks and Wildlife Department, the Hemphill Volunteer Fire Department, the SCSO, and community volunteers.

17. On November 11, 2013, the Texas Rangers joined the investigation and interviewed Wright's wife, Lauren Wright. Lauren Wright advised Ranger Danny Young that on the day Wright disappeared, she identified **Hadnot**'s telephone number from Wright's online cell phone records. Lauren Wright advised that she telephoned **Hadnot** and **Hadnot** admitted selling drugs to Wright on the day Wright disappeared. Lauren Wright's conversation with **Hadnot** was digitally recorded.

18. On November 15, 2013, the Wright family provided Wright's work computer to the Texas Rangers, but not his personal computer.

**First Superseding Indictment – Page 6**

19. On November 18, 2013, the Texas Rangers submitted physical evidence for analysis by the Texas Department of Public Safety Crime Lab. The physical evidence included the swab of a bloodstain from the barbed-wire fence (where Wright's torn clothing was located).

20. As the search progressed, law enforcement received numerous reports pertaining to Wright's potential whereabouts. Some of the reports alleged criminal activity in connection with Wright's disappearance. Investigators followed up on all of these reports but determined that none of the reports were credible.

21. On November 21, 2013, the Texas Rangers subpoenaed Wright's bank records.

22. On November 22, 2013, the Texas Rangers subpoenaed Wright's employment and patient records from Rehab-to-Go.

### Post Mortem Investigation

23. On November 25, 2013, after noticing a distinct odor, a volunteer search party found Wright's decomposing body. Wright's body was located between dense brush on a narrow game trail approximately 260 yards west of the residence on the same property that had been previously searched, approximately 1.10 miles northeast of the CL&M store. Wright's body was partially clothed. He was wearing underwear and one sock and both shoes. The Texas Rangers secured the recovery scene and, due to inclement weather, constructed a canopy over

First Superseding Indictment – Page 7

Wright's remains.  Law enforcement personnel and Wright's father remained with Wright's body throughout the night.

24. On November 26, 2013, a team of law enforcement personnel collected Wright's remains.  The team included the Texas Rangers, the Southeast Texas Forensic Center (STFC), the United States Forest Service, and the Jasper County Sheriff's Office.  Dr. John Ralston, a forensic pathologist with the STFC, assisted in the recovery and Wright's body was transported to the STFC in Beaumont, Texas.  The STFC serves as the morgue in Southeast Texas.

25. The same day, Dr. Ralston performed an autopsy on Wright which was witnessed by Texas Rangers.  Dr. Ralston found six shallow puncture wounds on Wright's body.  The puncture wounds each measured 0.2 inches and were located on Wright's left palm, lower abdomen, and left leg.  Dr. Ralston did not find any severe trauma on Wright's body, but noted soft-tissue damage to Wright's face and neck that was consistent with insect and animal scavenging activity.  Dr. Ralston found a cell phone inside Wright's right sock and a key-ring inside Wright's left shoe.  The key-ring included the keys to Wright's truck.

26. Dr. Ralston took blood and hair samples from Wright's body, and ordered toxicology testing by NMS Labs.  NMS Labs is a clinical toxicology and forensic testing laboratory based in Willow Grove, Pennsylvania.  Dr. Ralston did not make any preliminary determination of cause and manner of death.

**First Superseding Indictment – Page 8**

27. On December 3, 2013, Ranger Young returned to the residence off Coussons Drive where Wright's torn clothing was recovered from the barbed-wire fence. Ranger Young measured the barbs on the barbed-wire fence and determined that the barbs were consistent with the 0.2 inch puncture wounds that Dr. Ralston found on Wright's body.

28. On December 11, 2013, the Texas Rangers interviewed **Hadnot** for the first time. During the interview, **Hadnot** told Ranger Young that he had sold marihuana to Wright on November 7, 2013. **Hadnot** denied selling any other controlled substance to Wright on November 7, 2013, but **Hadnot** admitted selling cocaine to Wright in the past.

29. On or about December 12, 2013, the Wright family hired Dr. Lee Ann Grossberg to perform a second autopsy on Wright's body. Dr. Grossberg is a Houston-based forensic pathologist.

30. On December 13, 2013, Ranger Young received Wright's employment and patient records from Rehab-to-Go.

31. On December 18, 2013, Ranger Young interviewed the two patients whom Wright had visited on November 7, 2013.

32. On December 20, 2013, Ranger Young delivered recovery and autopsy photographs to Dr. Joan Bytheway for her review. Dr. Bytheway is a board certified forensic anthropologist and director of the Southeast Texas Applied

Forensic Sciences Center at Sam Houston State University.  Ranger Young asked Dr. Bytheway to determine whether Wright's body decomposition was consistent with the time Wright disappeared and the environmental conditions between his disappearance and his discovery.

33.   On January 7, 2014, NMS Labs released its toxicology report to the STFC.  The NMS Labs toxicology report concluded that Wright's blood contained cocaine, methamphetamine, and Xanax (alprazolam).  Later that day, the STFC released Dr. Ralston's final autopsy report on Wright.  Dr. Ralston's final autopsy report concluded that Wright's cause of death was combined drug intoxication, and Wright's manner of death was accident.  The same day, Dr. Bytheway reported to the Texas Rangers that the soft-tissue damage to Wright's face and neck was consistent with insect and animal scavenging activity.  The Texas Rangers then contacted the Wright family's attorney and requested a meeting with the Wright family.  Additionally, the Rangers renewed their request for permission to search Wright's personal computer and truck, but permission was never granted.

34.   On January 9, 2014, after unsuccessful attempts to remove data from Wright's cell phone, the Texas Rangers transported the phone for analysis by the Greater Houston Regional Computer Forensics Laboratory (GHRCFL) in Houston, Texas.

**First Superseding Indictment – Page 10**

35. The same day, the Texas Rangers submitted Dr. Ralston's autopsy report and all documentary evidence to forensic pathologist Dr. Sparks Veasey for his review. Dr. Veasey is a board certified forensic pathologist who serves as the Director of Forensic Services for Montgomery County, Texas.

36. On January 10, 2014, the Texas Rangers delivered a known sample of Wright's blood to the DPS Crime Laboratory in Houston. The same day, Ranger Travis Brazil returned to the residence off Coussons Drive where Wright's torn clothing was located on the barbed-wire fence. Ranger Brazil took additional measurements and photographs of three barbed-wire fences in the search area and forwarded the additional measurements and photographs to Dr. Veasey. The same day, Dr. Veasey reported to the Texas Rangers that he concurred with Dr. Ralston's finding that Wright's cause of death was combined drug intoxication, and Wright's manner of death was accident.

37. On January 16, 2014, the GHRCFL provided Ranger Young with the contents of Wright's cell phone, including phone call records and text messages. According to the call records, **Hadnot** received 35 calls from Wright's cell phone between October 8, 2013, and November 7, 2013. During the same time period, **Hadnot** placed just one call to Alfred Wright's cell phone. The calls average 30 seconds in length, with the longest call lasting one minute and 16 seconds. According to the text message records, during the two-day period before Wright's

**First Superseding Indictment – Page 11**

disappearance and death, **Hadnot** and Wright exchanged 20 text messages.  In

the text messages, **Hadnot** and Wright used coded terms to arrange drug

transactions.  The coded terms used by **Hadnot** and Wright were "half," "geno,"

"grammy," "handle," and "20."

38.  On January 20, 2014, Ranger Ken Parks interviewed **Hadnot** and **Hadnot**

explained the coded terms in the text messages.  **Hadnot** told Ranger Parks that

"half" means a half gram of cocaine, "geno" and "grammy" mean one gram of

cocaine, and "handle" means one Xanax tablet.  **Hadnot** denied that "20" means

$20 worth of methamphetamine.  During the interview, **Hadnot** said he sold

**Wright** a gram of cocaine and three Xanax tablets on November 7, 2013, the

day Wright disappeared.  **Hadnot** denied selling Wright methamphetamine on

that day, but admitted that he sold half-grams of cocaine to Wright on a daily

basis.

39.  On January 23, 2014, the Jasper County Sheriff's Office, with assistance from

the Drug Enforcement Administration, the Federal Bureau of Investigation, and

other law enforcement agencies, executed a narcotics search warrant at

**Hadnot**'s residence.  The agents found cocaine, methamphetamine, Xanax

(alprazolam), U.S. currency, and other drug trafficking paraphernalia.

40. On January 27, 2014, the DPS Crime Laboratory reported that the DNA extract from the bloodstain on the barbed-wire fence matched the DNA profile of Wright.

41. On February 12, 2014, the Texas Rangers submitted Dr. Ralston's autopsy report and all related documentary evidence to Dr. Harrell Gill-King for his review. Dr. Gill-King is a board certified forensic anthropologist and director of the Laboratory of Forensic Anthropology at the University of North Texas.  Dr. Gill-King also serves as a director of the Center for Human Identification at the UNT Health Science Center.

42. On March 10, 2014, the United States Attorney's Office, FBI, and Texas Rangers interviewed Lauren Wright.

43. On March 12, 2014, NMS labs reported that Wright's hair samples tested positive for cocaine, Cocaethylene (a metabolite of both cocaine and alcohol use simultaneously), and Benzoylecgonine (a metabolite of cocaine).  The existence of each indicates the use of cocaine over a period of time.

44. On March 19, 2014, Ranger Young and FBI Special Agent David Sutherland interviewed the Wright family's private investigator.  The private investigator was unable to provide any information or evidence that was useful to the investigation.

45. On May 2, 2014, Dr. Gill-King reported that, based on his review of the images and reports, that the period spanned by Wright's last sighting and the time of his discovery constitutes a reasonable postmortem interval and that Wright had expired at the location and in the position in which he was discovered.

46. On May 15, 2014, Dr. Lee Ann Grossberg released her autopsy report on Wright. Dr. Grossberg agreed with Dr. Ralston's conclusion and found that Wright's death was consistent with multiple drug toxicity and accident.

47. On June 25, 2014, the United States Attorney's Office sent all autopsy reports, toxicology reports, police reports, and witness statements to board-certified forensic toxicologist Dwain C. Fuller for his examination and analysis.

48. On July 28, 2014, Dwain Fuller opined that Wright's cause of death was consistent with combined drug intoxication and an associated condition known as excited delirium. Excited delirium is often induced by controlled substances, particularly stimulants, such as cocaine and methamphetamine and manifests as a combination of delirium, psychomotor agitation, anxiety, hallucinations, speech disturbances, disorientation, bizarre behavior, insensitivity to pain, and elevated body temperature. In many cases, the elevated body temperature results in the victim undressing. Excited delirium sometimes results in sudden death via cardiac or respiratory arrest, often at drug concentrations below those

**First Superseding Indictment – Page 14**

conventionally associated with acute overdose.  Several such cases are reported in the scientific literature.

### Count One

> Violation: 21 U.S.C. § 846
> (Conspiracy to Possess with Intent to
> Distribute and Distribute a Controlled
> Substance)

49. Beginning on or about August 22, 2013, the exact date being unknown to the grand jury, and continuing until on or about January 23, 2014, in the Eastern District of Texas, **Shane Dewayne Hadnot**, defendant, intentionally and knowingly conspired with other persons known and unknown to the grand jury, to possess with intent to distribute and distribute a Schedule II controlled substance, namely, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, and 5 grams or more of actual methamphetamine, and the distribution of the cocaine and methamphetamine significantly contributed to the death of Alfred Wright.

### Manner and Means of the Conspiracy

50. The purpose of the conspiracy was to enrich members of the conspiracy.  The manner and means by which this purpose was carried out included the following:

A. It was part of the conspiracy that **Hadnot** would obtain quantities of controlled substances to distribute.

**First Superseding Indictment – Page 15**

B.   It was part of the conspiracy that **Hadnot** would organize and maintain his inventory of controlled substances.

C.   It was part of the conspiracy that **Hadnot** would utilize a cell phone to accept orders for distribution of controlled substances.

D.   It was part of the conspiracy that **Hadnot** would accept United States currency as payment for distribution of controlled substances.

**Acts in Furtherance of the Conspiracy**

51.   In furtherance of the conspiracy, **Hadnot** performed the following overt acts in the Eastern District of Texas:

A.   Between October 8, 2013, at or about 6:02 p.m., and November 7, 2013, at or about 1:26 p.m., **Shane Dewayne Hadnot** used his cell phone to accept 35 calls from Wright's cell phone.  During the same time period, **Hadnot** placed just one call to Alfred Wright's cell phone.  The calls average approximately 30 seconds in length and are described as follows:

| Date | Time | Incoming/Outgoing | Duration |
|------|------|-------------------|----------|
| 10/08/13 | 6:02 PM | Incoming | 00:38 |
| 10/09/13 | 12:33 PM | Incoming | 00:34 |
| 10/09/13 | 7:59 PM | Incoming | 00:59 |
| 10/10/13 | 4:49 PM | Incoming | 00:37 |
| 10/12/13 | 4:09 PM | Incoming | 00:29 |
| 10/12/13 | 5:52 PM | Incoming | 00:33 |
| 10/13/13 | 5:23 PM | Incoming | 00:04 |
| 10/13/13 | 7:40 PM | Incoming | 00:18 |
| 10/14/13 | 7:04 PM | Incoming | 00:48 |

**First Superseding Indictment – Page 16**

| 10/16/13 | 5:10 PM | Incoming | 00:28 |
| 10/16/13 | 6:40 PM | Incoming | 00:28 |
| 10/17/13 | 5:41 PM | Incoming | 00:29 |
| 10/17/13 | 5:48 PM | Outgoing | 00:21 |
| 10/18/13 | 12:13 PM | Incoming | 00:20 |
| 10/19/13 | 8:51 PM | Incoming | 00:24 |
| 10/21/13 | 4:46 PM | Incoming | 00:19 |
| 10/22/13 | 5:14 PM | Incoming | 00:23 |
| 10/23/13 | 5:11 PM | Incoming | 00:15 |
| 10/23/13 | 9:18 PM | Incoming | 00:24 |
| 10/24/13 | 6:54 PM | Incoming | 00:45 |
| 10/25/13 | 5:45 PM | Incoming | 00:27 |
| 10/26/13 | 7:00 PM | Incoming | 00:28 |
| 10/28/13 | 7:36 PM | Incoming | 00:57 |
| 10/29/13 | 7:23 PM | Incoming | 00:22 |
| 10/30/13 | 4:54 PM | Incoming | 00:20 |
| 10/31/13 | 4:49 PM | Incoming | 00:30 |
| 10/31/13 | 4:54 PM | Incoming | 00:20 |
| 11/01/13 | 6:31 PM | Incoming | 00:17 |
| 11/02/13 | 5:41 PM | Incoming | 00:26 |
| 11/03/13 | 1:51 PM | Incoming | 00:26 |
| 11/03/13 | 5:58 PM | Incoming | 00:42 |
| 11/04/13 | 1:45 PM | Incoming | 00:34 |
| 11/04/13 | 1:48 PM | Incoming | 00:35 |
| 11/04/13 | 5:45 PM | Incoming | 00:24 |
| 11/05/13 | 8:34 PM | Incoming | 00:28 |
| 11/07/13 | 1:26 PM | Incoming | 01:16 |

B.   Between November 5, 2013, at or about 8:36 p.m., and November 7, 2013, at or

about 12:38 p.m., **Shane Dewayne Hadnot** used his cell phone to exchange text

messages with Alfred Wright's phone.   The partially coded text messages

average three words in length and are described as follows:

**First Superseding Indictment – Page 17**

| Date | Time | Hadnot/Wright | Message |
|------|------|---------------|---------|
| 11/05/13 | 8:36:09 PM | Hadnot | What's good |
| 11/05/13 | 8:36:43 PM | Wright | Half/ |
| 11/05/13 | 8:37:09 PM | Hadnot | Yea |
| 11/06/13 | 8:19:02 AM | Wright | Bro u up?? |
| 11/06/13 | 8:19:57 AM | Hadnot | Yea, what's up |
| 11/06/13 | 8:20:39 AM | Wright | 1 gino and 2 handles |
| 11/06/13 | 8:21:31 AM | Hadnot | What you mean one gino |
| 11/06/13 | 8:22:04 AM | Wright | grammy award |
| 11/06/13 | 8:22:40 AM | Hadnot | Ok |
| 11/06/13 | 2:49:08 PM | Wright | Half bro… |
| 11/06/13 | 2:49:36 PM | Hadnot | Ok |
| 11/06/13 | 5:28:40 PM | Wright | Some for twenty and one handle |
| 11/06/13 | 5:29:37 PM | Hadnot | Make sure u bring 26 dollars even |
| 11/06/13 | 7:51:33 PM | Wright | A twenty |
| 11/06/13 | 7:57:02 PM | Wright | U good? |
| 11/06/13 | 7:58:03 PM | Hadnot | Come on |
| 11/07/13 | 12:36:32 PM | Wright | Bro 1 gino and a 20 and 3 handles |
| 11/07/13 | 12:37:47 PM | Hadnot | ok |
| 11/07/13 | 12:38:08 PM | Wright | Show me love now…lol |
| 11/07/13 | 12:38:47 PM | Hadnot | Alright |

All in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## Count Two

> Violation: 21 U.S.C. §§ 841(a)(1) and
> 841(b)(1)(C) (Distribution of a
> Controlled Substance)

52. On or about November 7, 2013, in the Eastern District of Texas, **Shane

Dewayne Hadnot**, defendant, did knowingly and intentionally distribute a

Schedule II controlled substance, namely, a mixture or substance containing a

**First Superseding Indictment – Page 18**

detectable amount of cocaine and the use of the substance significantly

contributed to the death of Alfred Wright.

In violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

### Count Three

> Violation: 21 U.S.C. §§ 841(a)(1) and
> 841(b)(1)(C) (Possession with Intent to
> Distribute Cocaine)

53.   On or about January 23, 2014, in the Eastern District of Texas, **Shane Dewayne**

**Hadnot**, defendant, did knowingly and intentionally possess with intent to

distribute a Schedule II controlled substance, namely, a mixture or substance

containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

### Count Four

> Violation: 21 U.S.C. §§ 841(a)(1) and
> 841(b)(1)(B)(viii) (Possession with
> Intent to Distribute More than 5 Grams
> of Methamphetamine)

54.   On or about January 23, 2014, in the Eastern District of Texas, **Shane Dewayne**

**Hadnot**, defendant, did knowingly and intentionally possess with intent to

distribute a Schedule II controlled substance, namely, more than five (5) grams

of actual methamphetamine.

In violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii).

A TRUE BILL

_____C A J_____
GRAND JURY FOREPERSON

JOHN M. BALES
UNITED STATES ATTORNEY

JOHN B. ROSS
Assistant United States Attorney

10/1/2014
Date

**First Superseding Indictment – Page 20**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No.  1:14-CR-83 |
| v. | § | (Judge Marcia Crone) |
| | § | |
| SHANE DEWAYNE HADNOT | § | |

## NOTICE OF PENALTY

### Count One

Violation:        21 U.S.C. § 846

Penalty:          Not less than five (5) years imprisonment or more than forty
                  (40) years imprisonment, a fine not to exceed $5,000,000, or
                  both, and supervised release of not less than four (3) years or
                  more than life.

                  If any person commits such a violation after a prior
                  conviction for a felony drug offense has become final, not
                  less than  ten (10) years imprisonment or more than life.

Special Assessment:  $ 100.00

### Count Two

Violation:        21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Penalty:          Not  more than twenty (20) years imprisonment, a fine not
                  exceed $1,000,000, or both, and supervised release of not less
                  than three (3) years or more than life.

                  If any person commits such a violation after a prior
                  conviction for a felony drug offense has become final, not
                  more than thirty (30) years imprisonment.

Special Assessment:  $ 100.00

**First Superseding Indictment – Page 21**

## Count Three

Violation:          21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Penalty:            Not more than twenty (20) years imprisonment, a fine not
                    exceed $1,000,000, or both, and supervised release of not less
                    than three (3) years or more than life.

                    If any person commits such a violation after a prior
                    conviction for a felony drug offense has become final, not
                    more than thirty (30) years imprisonment.

Special Assessment:   $ 100.00

## Count Four

Violation:          21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii).

Penalty:            Not less than five (5) years nor more than forty (40 ) years
                    imprisonment, a fine not exceed $5,000,000, or both, and
                    supervised release of not less than four (4) years or more than
                    life.

                    If any person commits such a violation after a prior
                    conviction for a felony drug offense has become final, not
                    less than ten (10) years imprisonment or more than life.